Filed 10/28/22  Schwenk v. Bristol Farms CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN SCHWENK, | |
| Plaintiff and Respondent, | G060731 consol. w/ G061138 |
| v. | (Super. Ct. No. 30-2020-01162829) |
| BRISTOL FARMS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Randall J. Sherman, Judge.  Affirmed.

Constangy, Brooks, Smith & Prophete, Kimberly M. Talley, Steven B. Katz, Anthony Sbardellati and Joanna E. MacMillan, for Defendant and Appellant.

Diversity Law Group and Larry W. Lee; Law Offices of Choi & Associates and Edward W. Choi; Hyun Legal and Dennis S. Hyun; Polaris Law Group and William L. Marder, for Plaintiff and Respondent.

\*          \*          \*

Defendant Bristol Farms appeals from an order denying its motion to compel arbitration of representative claims brought by its employee plaintiff John Schwenk. This underlying employment case is based on wage and hour claims. Seven months after Schwenk filed his case in the trial court, Bristol Farms distributed to its employees an arbitration agreement to include a broad range of claims, including those involved in this litigation. The agreement contained an opt-out procedure for employees to follow if they did not want to be bound by the agreement.

It is undisputed that one day after Schwenk signed and submitted the acknowledgment page of the arbitration agreement, he asked for it back, and shredded it. He crossed out his signature on the receipt tracking list in the presence of a Bristol Farms administrator who then initialed and confirmed the change on the form.

Bristol Farms contends Schwenk impliedly assented to the proposed agreement to arbitrate. The trial court rejected the contention because it found Schwenk did not assent to the agreement. We agree and affirm.


FACTS

*The Postlitigation Proposed Arbitration Agreement*

Schwenk began working for Bristol Farms in 2009. In September 2020, he filed the lawsuit underlying this action, styled a "class action complaint for[] violation of Labor Code [section] 226; and []violation of Labor Code [sections] 2689, et seq" (capitalization omitted.) Schwenk alleged the first cause of action on behalf of himself and a putative class and the second cause of action on behalf of himself and the state pursuant to the Private Attorneys General Act (PAGA). Bristol Farms filed a demurrer to the complaint that was overruled; then it filed its answer in February 2021.[1]

---

[1] Bristol Farms filed an unsuccessful writ petition asking this court to reverse the trial court's demurrer ruling. The petition is immaterial to this appeal.

2

In May 2021, Bristol Farms created the document central to this appeal, titled the "Mutual Agreement to Arbitrate Disputes" (the arbitration agreement), and distributed it to its employees.  The arbitration agreement stated that if consent was given, it would "govern[] how disputes and claims that arise out of or relate to the employment relationship between [employees] and [Bristol Farms and an entity unrelated to this appeal] w[ould] be resolved."

The agreement contains four proposed terms central to this appeal:  (1) any employee consenting to the agreement was agreeing "that any claim, complaint, or dispute covered by the [a]greement . . . w[ould] be resolved by final and binding arbitration"; (2) the agreement specifically covered this lawsuit; (3) that all employees who received a copy of the agreement had 30 days from receipt to comply with an "opt out" procedure; and (4) that any employee who received a copy of the agreement and did not follow the "opt out" procedure would be "deemed to [have] accept[ed] the agreement."

The final page of the arbitration agreement, titled "ACKNOWLEDGMENT," contains four blank spaces titled "date", "employee [identification]", "print name", and "signature."  Above them are two paragraphs in all-capitalized and bolded font (unique to the entire agreement), that use variations of the phrases "I acknowledge" or "I understand."  For example, the first and second sentences of the page state:  "I ACKNOWLEDGE THAT I HAVE RECEIVED A COPY OF THE MUTUAL AGREEMENT TO ARBITRATE DISPUTES AND THAT I HAVE BEEN INSTRUCTED TO REVIEW THE AGREEMENT CAREFULLY AND MAKE SURE THAT I UNDERSTAND IT.  I UNDERSTAND THAT I HAVE THIRTY (30) CALENDAR DAYS AFTER I ACKNOWLEDGE RECEIPT OF THE AGREEMENT TO REVIEW AND EXCLUDE MYSELF FROM IT AND THAT FAILURE TO DO SO WILL BE DEEMED AN ACCEPTANCE OF THE AGREEMENT."  In contrast, the final sentence of the page also states:  "I ALSO ACKNOWLEDGE . . . THAT I HAVE

3

ENTERED INTO THIS AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS MADE BY THE COMPANY OTHER THAN THOSE CONTAINED IN THE AGREEMENT."

According to undisputed evidence that was presented to the trial court, on May 4, 2021, a Bristol Farms store operations administrator physically delivered the arbitration agreement to Schwenk, who signed both the final page and the receipt tracking list of employees who were given a copy of the agreement. According to the administrator's declaration, the following undisputed events took place the next day: "Mr. Schwenk came to the office and asked me to give him back the [a]cknowledgment page, and I [i.e., the administrator,] returned it to [Schwenk] at his request. He took the [a]cknowledgment page to the shredder and shredded it in my presence. He also drew a line through his signature off the roster that I provided to him [i.e., the receipt tracking list]. I placed my initials on the line that previously bore Mr. Schwenk's signature."

The Bristol Farms administrator's declaration also added: "A few days later, another employee whose name I do not recall asked me in the presence of Mr. Schwenk whether they needed to send a certified letter to opt out of the Arbitration Agreement if they did not sign and return the Acknowledgment page. I told this employee 'yes.' Mr. Schwenk then looked at me and asked, 'certified letter?' I replied 'yes.'"

Seventy days after Schwenk shredded the arbitration agreement and crossed out his signature on Bristol Farms's receipt tracking list, counsel for both Bristol Farms and Schwenk met and discussed the agreement. Meanwhile, between the shredding of the agreement, and the discussion between counsel, Schwenk's lawsuit had moved forward with Schwenk's counsel propounding two sets of initial discovery requests to Bristol Farms, and the parties filing a second joint case management statement with the trial court without mentioning the arbitration agreement or that either party would seek arbitration.

4

Thirty days after the respective parties' counsel discussed the arbitration agreement, Bristol Farms filed a motion to compel arbitration. It submitted declarations in support of the motion and Schwenk's counsel presented opposing declarations. Relevant to this appeal, Schwenk asserted: "I initially signed and dated the form [i.e., the arbitration agreement's acknowledgment page], but after reviewing the arbitration agreement, I crossed out my signature and date as I did not want to be bound by the arbitration agreement."

*The Trial Court's Denial of Bristol Farms's Motion to Compel Arbitration*

The trial court denied Bristol Farms's motion. The court recited the arbitration agreement's acknowledgment page stating "I understand that I have 30 calendar days after I acknowledge receipt of the agreement to review and exclude myself from it" (capitalization and bolding omitted), and noted that the page did not say how exclusion should occur. The court referenced the instructions of the opt out procedure in the arbitration agreement—i.e., "You have the right to opt out of this Agreement if you wish. To do so, you must send a letter to Legal Department . . ."—but found Schwenk "never signed this agreement, and therefore never agreed that sending a letter to defendant's Legal Department was the only way he could opt out of the arbitration agreement."

The trial court then reasoned: "The day after [Schwenk] returned the [a]cknowledgment page, he went to [Bristol Farms]'s office and asked [the Bristol Farm's administrator] to give him back his [a]cknowledgment page, and she did so. [Schwenk] took the [a]cknowledgment page to the shredder and shredded it in [the administrator]'s presence. He also drew a line through his signature on the [receipt tracking list]. [The administrator] placed her initials on the line that previously bore plaintiff's signature. Based on these facts, that [Schwenk] never signed the Mutual Agreement to Arbitrate Disputes, but only acknowledged receiving a copy, that

5

[Schwenk] shredded his signed [a]cknowledgment page and crossed out his [receipt tracking list] signature one day later, and that [Bristol Farms]'s authorized agent [i.e., the administrator] initialed the line that previously bore [Schwenk]'s signature, the court concludes that [Schwenk] never agreed to arbitrate his claims against Bristol Farms, and as a result, Bristol Farms may not compel plaintiff to arbitrate those claims."

Bristol Farms appealed from the trial court's denial order (Code Civ. Proc., § 1294, subd. (a)) and the trial court granted a stay. Schwenk's counsel subsequently filed lawsuits that resulted in an effectively identical ruling that Bristol Farms also appealed from; the appeals have been consolidated and our discussion here resolves both.

## DISCUSSION

Bristol Farms contends a reversal of the trial court's denial order is required because, as a matter of law, Schwenk's failure to comply with the opt out procedure in the arbitration agreement resulted in his assent to the agreement. We disagree.

*Governing Law and Appellate Principles*

"[W]hen a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable. Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence." (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413.)

""""[W]hen ruling on a petition to compel arbitration, the superior court may consider evidence on factual issues such as contract formation bearing on the threshold issue of arbitrability.""" (*Rebolledo v. Tilly's, Inc.* (2014) 228 Cal.App.4th 900, 913 (*Rebolledo*); accord, *Caron v. Andrew* (1955) 133 Cal.App.2d 412, 416 ["'It is generally

6

held that the existence of an implied contract is usually a question of fact for the trial court.  Where evidence is conflicting, or where reasonable conflicting inferences may be drawn from evidence which is not in conflict, a question of fact is presented for decision of the trial court'"].)

On appellate review, we focus on the correctness of the ruling's result and not its reasons.  (See *Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 939; accord *Esparza v. Sand & Sea, Inc.* (2016) 2 Cal.App.5th 781, 791-792.)  We also apply to an appellant's contentions "three fundamental principles of appellate review:  (1) a judgment [or order] is presumed  correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error."  (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.)

The controlling standard of review depends on the challenge asserted.  If a trial court's order denying arbitration "'is based on a decision of fact, then we adopt a substantial evidence standard.  [Citations.]  Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed.'"  (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 60.)  "Interpreting a written document to determine whether it is an enforceable arbitration agreement is a question of law subject to de novo review when the parties do not offer conflicting extrinsic evidence regarding the document's meaning."  (*Ibid.*)

"General principles of contract law determine whether the parties have entered a binding agreement to arbitrate."  (*Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416, 420.)  "'The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting.  When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible.  "The words of a contract are to be understood in their ordinary and popular sense."'"  (*Rebolledo, supra*, 228 Cal.App.4th at p. 913, internal citations omitted.)

7

"It is essential to the existence of a contract that there should be," among other elements, "consent" by the contracting parties. (Civ. Code § 1550, subd. 2.)[2] "The consent of the parties to a contract must be: [¶] 1. Free; [¶] 2. Mutual; and, [¶] 3. Communicated by each to the other." (§ 1565.) "Consent is not mutual, unless the parties all agree upon the same thing in the same sense. But in certain cases defined by the Chapter on Interpretation, they are to be deemed so to agree without regard to the fact." (§ 1580.)[3]

*Analysis*

"The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe. (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 88, pages 92-93.) Accordingly, the primary focus in determining the existence of mutual consent is upon the acts of the parties involved." (*Meyer v. Benko* (1976) 55 Cal.App.3d 937, 942-943 (*Meyer*); accord, *Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 579-580 ["'mutual consent is gathered from the reasonable meaning of the words and acts of the parties, and not from their unexpressed intentions or understanding'"].)

The reasonable meaning of Schwenk's undisputed conduct—i.e., signing the acknowledgment page of the arbitration agreement and, one day later, recovering it from the Bristol Farms administrator, shredding it, crossing out his signature on the receipt tracking list, and securing the administrator's written acknowledgment of his

---

[2]     All further undesignated references are to the Civil Code unless otherwise designated.

[3]     The referenced "Chapter on Interpretation" contains sections 1635 through 1663, and none of them are relied upon by Bristol Farms in this appeal.

8

conduct—objectively manifested a *lack* of consent to be bound by Bristol Farms's proposed agreement.

As discussed ante, the agreement contained a 30-day window in which recipients of the document could "opt out." As noted, the acknowledgment page Schwenk signed did not expressly reference the opt out provision but did state: "I UNDERSTAND THAT I HAVE THIRTY (30) CALENDAR DAYS AFTER I ACKNOWLEDGE RECEIPT OF THE AGREEMENT TO REVIEW AND EXCLUDE MYSELF FROM IT."

The trial court correctly decided Bristol Farms had not shown mutual consent in this case based on undisputed facts. Substantial evidence supports the court's finding that Schwenk "never agreed to arbitrate his claims against Bristol Farms" because Schwenk's undisputed outward manifestations of conduct would lead a reasonable person to believe his consent did not exist. (*Meyer, supra*, 55 Cal.App.3d at pp. 942-943; see *Diaz v. Sohnen Enterprises* (2019) 34 Cal.App.5th 126, 134 (*Diaz*) ["'"'[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law"'"'"].)

Given that the trial court correctly ruled Bristol Farms's motion failed on the threshold issue of contract formation, we need not consider the issues of conscionability within the arbitration agreement. (See *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114.)

*Bristol Farms's Contentions*

Bristol Farms argues it is entitled to a reversal as a matter of law based on a two-part argument: (1) Schwenk agreed to Bristol Farms's arbitration agreement by continuing employment; and so (2) Schwenk's failure to comply with the "opt out" procedure in the arbitration agreement constituted his consent to be bound by the arbitration agreement's terms.

9

In response, Schwenk notes the Legislature's recent enactment of Labor Code section 432.6. (Stats. 2019, ch. 711, § 3.) The statute provides in relevant part that no person may require an "employee to waive any right, forum, or procedure for a violation of [the Labor Code], including the right to file and pursue a civil action or a complaint with, or otherwise notify, any state agency, other public prosecutor, law enforcement agency, or any court." (*Id.*, subd. (a).) Labor Code section 432.6, subdivision (c), includes in its definition of prohibited dealings any "agreement that requires an employee to opt out of a waiver or take any affirmative action in order to preserve their rights." Another subdivision states: "Nothing in this section is intended to invalidate a written arbitration agreement that is otherwise enforceable under the Federal Arbitration Act [FAA] (9 U.S.C. Sec. 1 et seq.)." (*Id.*, subd. (f).)

Applied facially, Labor Code section 432.6, subdivisions (a) and (c), are fatal to Bristol Farms's argument that its opt out procedure shows Schwenk consented to the arbitration agreement. Bristol Farms asserts the statute "does not apply" due to preemption by the FAA and points out the arbitration agreement it proposed to Schwenk contains a provision stating the FAA "governs" the agreement. But given that a lack of mutual consent required for contract formation is the dispositive issue here, the enforceability of the provision is also immaterial to our analysis of this appeal.

Given the fluidity of authorities touching on FAA preemption (see, e.g., *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. ___, ___ [142 S.Ct. 1906, 1917-1918]), in addition to the facial invalidity of Bristol Farms's opt out provision under Labor Code section 432.6, we also separately conclude that Bristol Farms's contention for reversal under the specific facts of this case fail on a simpler ground: Schwenk was not limited to objectively expressing his lack of consent to Bristol Farms's proposed agreement in the manner specified by the opt out procedure because the circumstances shown by the record fail to support an implied consent theory of contract formation.

Bristol Farms correctly notes that California cases that have not applied Labor Code section 432.6 have supported a theory of implied consent to an employment-related contract based on a lack of direct action—i.e., continuing to work for an employer who has proposed an arbitration agreement and provided a conscionable opt out window. (See *Diaz, supra*, 34 Cal.App.5th at p. 130 ["when an employee continues his or her employment after notification that an agreement to arbitration is a condition of continued employment, that employee has impliedly consented to the arbitration agreement"]; see § 1621 ["An implied contract is one, the existence and terms of which are manifested by conduct"]; see also *Circuit City Stores, Inc. v. Najd* (9th Cir. 2002) 294 F.3d 1104, 1109 [interpreting California law].)

However, we do not view case law as representing a categorical rule that an employee by virtue of continuing to work for an employer will become bound by unilaterally proposed contract terms. Instead, case law shows that application of the implied-in-fact theory of contract formation must be considered on a case-by-case basis, based upon the facts of each particular case.

Here, in addition to the reasons we discussed about Schwenk's objective conduct, the totality of the undisputed factual circumstances do not support a conclusion he impliedly consented to Bristol Farms's proposed arbitration agreement by failing to comply with the agreement's opt out procedure. The record shows that all relevant dealings between Schwenk and Bristol Farms occurred in a postlitigation context—specifically, over seven months after Schwenk had filed his lawsuit. Bristol Farms, a sophisticated employer, knew during the time these dealings were taking place that Schwenk was represented by counsel, and presumably that Schwenk's litigation would be fundamentally influenced by the arbitration agreement. Bristol Farms asserts in its briefing there is "no evidence in the record that counsel prepared the [a]rbitration [a]greement." However, there is a strong inference of such because the proposed

11

agreement required Schwenk to contact Bristol Farm's affiliated legal department in order to opt out of the agreement.

The record supports a conclusion that Bristol Farms did not mention to Schwenk's counsel its direct dealings with Schwenk until after the purported 30-day opt out window had expired. Bristol Farms is effectively arguing for a holding that, as a matter of law, its dealings with Schwenk that did not include his counsel, created a legally binding agreement—an agreement that would extinguish Schwenk's ability to litigate a lawsuit already initiated, all because Schwenk did not communicate his rejection of Bristol Farms's arbitration agreement in a manner that Bristol Farms had unilaterally proposed. We decline to endorse such a view of contract formation and none of the implied consent cases Bristol Farms cites contains factual circumstances that persuade us otherwise.

Schwenk's ability to outwardly manifest his intention about whether to consent to Bristol Farms's proposed agreement was broader than the opt out procedure Bristol Farms relies on. Accordingly, independent of Labor Code section 432.6's effect, Bristol Farms has not shown the reversible error it needs to prevail on appeal.

Bristol Farms argues that section 1582 supports its position that Schwenk was only allowed to manifest nonconsent by following Bristol Farms's opt out procedure. Not so. The statute states: "MODE OF COMMUNICATING ACCEPTANCE OF PROPOSAL. If a proposal prescribes any conditions concerning the communication of its acceptance, the proposer is not bound unless they are conformed to; but in other cases any reasonable and usual mode may be adopted." Bristol Farms attempts to turn the statute on its head by arguing that an offeree can only *reject* an offer by following the specifications of an offeror's terms. The statute lends no support to a party arguing implied consent for contract formation. Finally, Bristol Farms's attempt to characterize its arbitration agreement as a "unilateral offer of novation" offers no support for its position because it does nothing to alter our analysis about the controlling issue of

12

contract formation.  (See *Alexander v. Angel* (1951) 37 Cal.2d 856, 860 [novation requires the showing of a superseding obligation that must be shown by clear and convincing evidence].)

DISPOSITION

The trial court's order denying Bristol Farms's motion to compel arbitration is affirmed.  Schwenk is entitled to his costs on appeal.

MARKS, J.*

WE CONCUR:

GOETHALS, ACTING P. J.

SANCHEZ, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.